UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


IN RE: KING PHARMACEUTICALS,    )      NO. 2:03-CV-77
INC. SECURITIES LITIGATION      )      District Judge Phillips
                                 )      Magistrate Judge Inman


REPORT AND RECOMMENDATION
REGARDING MOTION FOR ALLOCATION OF ATTORNEYS FEES (DOC. 308)


A dispute regarding the appropriate allocation of attorneys' fees between two law firms has been referred to the magistrate judge for a report and recommendation.[1]

This was a class action suit. The court uses the word "was" because the suit has now been settled and is in the final stages of being wound up. From the outset, this suit consisted of two separate groups of plaintiffs. One group was denominated the "open market group," those people or entities who purchased King Pharmaceutical stock on the open market during the relevant time period. The other group consisted of those individuals or entities who owned stock in Jones Pharmaceutical, Inc., and who subsequently acquired King Pharmaceutical stock by virtue of the corporate merger of Jones Pharmaceutical and King Pharmaceutical; this group was dubbed the Jones Merger Group.[2]

Two individuals originally asked to be appointed lead plaintiffs for the Jones Merger

---

[1]Order, Doc. 309.

[2]*See*, Report and Recommendation, Doc. 60, 7-31-03; Order, Doc. 66, 8-15-03.

Group, Jim O'Neil and Kathleen Crews. Mr. O'Neil was represented by the law firm of Weiss & Lurie ("Weiss"), and Ms. Crews was represented by Abbey Spanier Rodd Abrahams & Paridis ("Abbey").

With respect to the Jones Merger Group, the only dispute was whether there should be a separate group (and, ultimately, a separate sub-class) at all. After concluding that there ultimately could be conflicts between those who purchased King Pharmaceutical stock on the open market and those who acquired King Pharmaceutical stock by virtue of the corporate merger, this court opted in favor of creating separate lead plaintiffs for each group. There never was a dispute between Mr. O'Neil and Ms. Crews regarding their appointment as co-lead plaintiffs for the Jones Merger Group.[3]

A consolidated class action complaint was filed on October 21, 2003.[4] Thereafter, the suit commenced in earnest; a plethora of motions were filed, the most significant of which were Rule 12(b)(6) motions to dismiss for failure to state a cause of action. Some of those motions were granted, but most were not.[5]

On December 6, 2004, Mr. O'Neil filed a motion to withdraw as a lead plaintiff for the Jones Merger Group.[6] In his declaration filed in support of his motion to withdraw, Mr. O'Neil recited that his "personal familiarity with persons associated with the defendants

---

[3]*See*, Report and Recommendation, Doc. 60, 7-31-03; Order, Doc. 66, 8-15-03.

[4]Doc. 80.

[5]*See*, Report and Recommendation, 7-12-04, Doc. 147; Order, 8-11-04, Doc. 162.

[6]Doc. 187.

. . . thereafter [could] . . . affect my ability to provide fair and adequate representation to the merger class and [could] be perceived as presenting a conflict of interest . . . ."[7] Mr. O'Neil went on to state that Katheleen Crews could adequately represent the interests of the Jones Merger Sub-Class. The court subsequently granted Mr. O'Neil's motion to withdraw.[8] Notwithstanding that Mr. O'Neil was represented by the Weiss law firm, and Ms. Crews by the Abbey firm, Weiss's status as co-counsel for the remaining lead plaintiff in the Jones Merger Group was not affected; in other words, Weiss continued as co-counsel for the Jones Merger Sub-Class, along with the Abbey firm.

On June 13, 2005, an agreed order was entered that certified the suit as a class action under Rule 23.[9] That same day, a report and recommendation was filed that recommended that the Jones Merger Group be certified as a sub-class, and that Kathleen Crews should be designated as the representative of that sub-class.[10] No one objected to that report and recommendation, and it ultimately was approved and adopted by District Judge Phillips on August 10, 2005.[11] As before, both Weiss and Abbey continued in their joint representation of the sub-class.

On September 20, 2005, a scheduling conference was held, and the trial was

---

[7]Doc. 187, part 3.

[8]Order, Doc. 189, 12-27-04.

[9]Doc. 221.

[10]Doc. 222.

[11]Order, Doc. 249.

scheduled for April 10, 2007.[12]  Discovery proceeded over the course of the next several months, as did efforts at mediation and settlement.  Happily, the lead plaintiffs for the class and sub-class subsequently filed a motion for preliminary approval of a settlement of the entire case.[13]  An order that preliminarily approved the settlement was entered on September 27, 2006.[14]  On December 19, 2006, the lead plaintiffs for both the main class and the sub-class filed a motion requesting that the proposed settlement and Plan of Allocation of the settlement proceeds be approved.[15]  At the same time, they filed a motion for approval of attorneys' fees and reimbursement of litigation expenses.[16] Under the Settlement Agreement, the defendants were to make a cash payment of $38,250,000.00 which, after payment of attorneys' fees and litigation expenses, would be distributed to the class and sub-class members on the basis set out in the Plan of Allocation.  The attorneys requested an award of attorneys' fees amounting to 17% of the *net* settlement proceeds, i.e., 17% of $38,250,000.00 less litigation expenses.  That percentage figure, so the motion recited, represented only 56.5% of the attorneys' fees that would have resulted if a straight hourly-rate had been used.[17]  No one objected to the fee request.

---

[12]Order, Doc. 259.

[13]Doc. 227, 8-28-06.

[14]Doc. 280.

[15]Doc. 282.

[16]Doc. 283.

[17]Doc. 283.

In support of the fee request, the attorneys filed a "Compendium of Declarations."[18] Included within each of these declarations there was a summary of the total "Lodestar" fees for every attorney in the case. That summarization recited that Weiss had expended 3520.25 hours in his representation of the Jones Merger Sub-Class, and that Abbey had expended 919 hours. At their respective hourly rates, Weiss had a total "Lodestar" of $1,697,577.50, and Abbey had a total Lodestar of $413,127.50. Weiss had litigation expenses amounting to $140,949.88; Abbey had litigation expenses totaling $80,134.06. All these numbers and figures were supplied, respectively, by Weiss and Abbey, and neither disputed the figures of the other.

And it is at this point that the dispute between Weiss and Abbey arises. According to Weiss' motion for allocation of attorneys' fees among counsel for the Jones Merger Sub-Class, there is $1,000,000.00 which must be divided between Weiss and Abbey for their respective services rendered during the course of this litigation.[19] The declaration of Mr. Weiss which accompanies the foregoing motion recites that Abbey has rejected out of hand Weiss' proposal that the $1,000,000.00 be allocated between them in proportion to their respective Lodestars; Weiss says that Abbey insists that the Abbey firm be paid $400,000.00 in fees, or nearly 100% of its Lodestar. That would mean, of course, that Weiss would receive the remaining $600,000.00, or approximately 35% of its Lodestar.[20] Weiss argues

---

[18]Docs. 285, 286.

[19]Doc. 308.

[20]Doc. 308-2.

that this allocation bears no relation to the services actually rendered and is unfair.

Attorney Arthur Abbey filed his own declaration[21] in response, arguing that "the allocation proposed by co-lead counsel Weiss & Lurie, which would take 80 percent of the fee for itself is grossly unfair . . . [because] . . . [t]his strictly mathematical allocation under-compensates Abbey Spanier for its critical and fundamental contribution, with our primary client, Lead Plaintiff, Kathleen Crews, to the establishment, maintenance, and success of the Jones Merger Sub-Class.[22]  Abbey argues that Weiss was not candid with the court regarding the status of its client, Jim O'Neil, and that it was Kathleen Crews, Abbey's client, who "saved the day" for the Jones Merger Sub-Class, so to speak, after O'Neil was forced to withdraw.  In other words, Abbey argues that it should be awarded a fee disproportionate to the actual hours expended by it because it was Abbey's client, Ms. Crews, who ultimately served as the sole lead plaintiff for the sub-class, whereas Weiss' client, Mr. O'Neil, had to remove himself as "co-lead plaintiff" because of a conflict of interest.

Respectfully, the court disagrees with Abbey's theory.  Reduced to its essence, Abbey says that it be compensated, not on the basis of the work that law firm performed, but rather on the identity of its client.  As Weiss aptly notes in its Reply Declaration,[23] Abbey was content to allow Weiss to continue representing the sub-class notwithstanding the departure of Mr. O'Neil.  If Abbey believed that furnishing a client for the representation of the sub-

---

[21]Doc. 312.

[22]Doc. 312, p. 2.

[23]Doc. 319.

class somehow entitled it to a premium fee, fundamental fairness required Abbey to so advise Weiss immediately so that the dispute could then be resolved by the court; if the court agreed with Abbey's position, at least Weiss could pass the litigation ball to Abbey and insist that Abbey run with it. However, Abbey allowed Weiss to expend the time *and money* that it did, choosing never to broach the subject of a disproportionate fee until this suit was settled.

There is $1,000,000.00 plus some accrued interest which is to be divided between Weiss and Abbey for their respective services. The time that each of those law firms expended is uncontroverted: Weiss expended 3520.25 hours, and Abbey expended 919. The fair way to allocate the fee between these two law firms is based upon the hours actually expended by each. Together the two firms expended 4439.25 hours. As noted, Weiss' firm expended 3520.25 hours, or approximately 79% of the total; Abbey's firm expended 919 hours, or approximately 21% of the total. The respective Lodestars bear approximately the same proportion to each other. The total Lodestar amounts to $2,110,705.00. Weiss' Lodestar of $1,697,577.50 is slightly less than 80% of the total, and Abbey's Lodestar of $413,127.50 is slightly more than 20% of the total. The expenses total $221, 083.94. Weiss' expenses of $140,949.88 is 64% of the total, and Abbey's expenses of $80,134.06 is 36% of the total.

These undisputed numbers reflect that the Weiss law firm expended nearly 4 times the number of hours in representing the Jones Merger Sub-Class, than did Abbey. The fact that Weiss' original client, Mr. O'Neil, subsequently withdrew as a co-lead plaintiff is utterly inconsequential. For whatever it is worth, and it is worth very little, Mr. O'Neil's conflict

arose only after additional parties-defendant were added to this suit (representatives of Jones Pharmaceutical).[24]  As already noted previously, Weiss continued to perform legal services to the sub-class with the consent of Abbey.

At one of the early hearings in this matter, when various individuals and entities were vying for the status of being appointed a lead plaintiff for one group or the other, and during which the courtroom was barely large enough to hold all the lawyers, this magistrate judge felt constrained to advise those assembled lawyers that the court would not countenance duplication of legal services, and that the court would not approve payment of unnecessary duplicitive work.  The attorneys obviously took that advice to heart, inasmuch as one attorney or the other periodically remarked in subsequent hearings that they strenuously were attempting to apportion and allocate legal work to avoid duplication.  Weiss expended four times more hours than did Abbey in representing the sub-class, without objection from Abbey.  Allocating the fees between Weiss and Abbey on the basis of the proportion that their respective Lodestars bear to one another is logical; allocating the fees on any other basis, including doing so on the basis of the identity of a lead plaintiff,  would be utterly arbitrary.

It is respectfully recommended that the Weiss law firm be authorized to received 80% of the total funds allocated for payment of the sub-class attorneys, and that the Abbey law firm be allocated 20%.  To the extent the "fee fund" has earned any interest, that interest

---

[24]Doc. 319, ¶. 3.

should be allocated between the two firms on the same percentage basis.

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

Respectfully submitted,

s/ Dennis H. Inman
United States Magistrate Judge